UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

HOLLY PARKS, as Administrator of the
Estate of her daughter HEATHER ROSELLI,

                                    Plaintiff,          Case #20-CV-06384-FPG

        v.                                              DECISION AND ORDER

LAURA SALTSMAN, DAVID VIGGIANI,
PAUL STEVENS, JENNIFER WALL,
STACEY VALDER, THOMAS
FITZSIMMONS, SARAH DILALLO,
SANDRA ABDO, JASMINE HINES, and
JOHN/JANE DOES 1-10,
                                    Defendants.

## INTRODUCTION

Represented by counsel, Plaintiff Holly Parks commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983") on behalf of her daughter, Heather Roselli ("Heather"), who was killed on June 18, 2017, while in the care of the New York State Office for People with Developmental Disabilities ("OPWDD"). ECF No. 1. Defendants Laura Saltsman, David Viggiani, Paul Stevens, Jennifer Wall, Stacey Valder, and Thomas Fitzsimmons, all of whom hold supervisory positions with OPWDD, have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) ("Rule 12(b)(6)"). ECF No. 15.  For the reasons discussed below, the Motion to Dismiss, ECF No. 15, is GRANTED, and the Clerk's Entry of Default previously issued as to Thomas Fitzsimmons, ECF No. 28, is VACATED, on consent of the parties.

## BACKGROUND

Born in 1981, Heather was diagnosed with cognitive disabilities. ECF No. 1, ¶¶ 34-35. She lived at home until the age of 21, when her mental health conditions necessitated her placement in an Individualized Residential Alternatives facility ("IRA") operated by the Finger Lakes Developmental Disabilities Office State Office ("DDSO") and overseen by OPWDD. *Id.*, ¶ 36. Due to her tendency to become agitated and engage in aggressive behavior towards others, Heather required specialized care and close staff supervision. *Id.*, ¶ 41. Caregivers frequently had to call the police to effectuate mental hygiene arrests ("MHAs") and have Heather brought to the hospital for treatment. *Id.*, ¶¶ 42-45. At the time of her death, Heather was living at an IRA located at 30 Pierce Street in the Town of Webster, New York ("30 Pierce"). *Id.*, ¶ 36.

In early spring of 2017, Heather's mental state began deteriorating as a result of personal losses; her psychologist observed "significantly increased anxiety, mood lability, extreme argumentativeness and attention seeking, noncompliance, verbal aggression and physical aggression." *Id.*, ¶¶ 49-50. Her behavioral support plan ("BSP") was modified in part to direct staff to "closely regulate" Heather's use of the house phone and to address her phone use primarily through "positive reinforcement." *Id.*, ¶ 49. Heather also had to be placed in various forms of restraint in the months leading up to her death. *Id.*, ¶ 52.

Pursuant to the Strategies for Crisis Intervention and Prevention-Revised ("SCIP-R"), a policy adopted by OPWDD and DDSO, a "restrictive personal intervention," or "temporary floor restraint," of a person is to be used "only in 'crisis situations' where 'physical intervention is necessary to prevent injury.'" *Id.*, ¶ 64. After ten minutes, staff must notify a supervisor on duty and consider other methods of intervention. *Id.*, ¶ 65. The SCIP-R mandates that an individual "<u>must be released</u>" after being restrained for 20 minutes. *Id.* (underlining in original). Staff must

"'NOT ever roll [the] person onto their stomach or place any pressure on the individual's back.'" *Id.* (capitals in original)

On June 18, 2017, which was Father's Day, Sarah DiLallo ("DiLallo"), Sandra Abdo ("Abdo"), and Jasmine Hines ("Hines") (collectively, the "Employee Defendants") were the direct supervising assistants on duty at 30 Pierce. DiLallo and Hines were both trainees; all three individuals had received SCIP-R training. *Id.*, ¶ 81.

Heather went into the office during the afternoon of the 18th and asked to use the phone to call her step-father. *Id.*, ¶ 70.  DiLallo said no, and Heather became agitated. *Id.*, ¶ 71. DiLallo started arguing with Heather, who picked up a chair. *Id.*, ¶ 75. DiLallo removed the chair from Heather's hands and said, "'You're going down!'" *Id.* DiLallo pulled Heather to the floor and, for the next 20 minutes, DiLallo, Abdo, and Hines restrained Heather on her back. *Id.*, ¶¶ 75-76. Heather continued to move around but did nothing that could physically harm the Employee Defendants. *Id.*, ¶ 77. During the restraint, Abdo slapped Heather across the face, and DiLallo called Heather "'stupid'" and a "'retard.'" *Id.*, ¶¶ 79-80.

After about 20 minutes, DiLallo suggested flipping Heather onto her stomach. Hines and Abdo agreed. *Id.*, ¶¶ 82-84. They proceeded to restrain Heather on her stomach for another 25 minutes. *Id.*, ¶¶ 84, 90. DiLallo and Abdo pressed Heather's face into the carpet and leaned on her back. *Id.*, ¶ 86. During this time, the Employee Defendants discussed, but decided against, calling 911 because it would be viewed by Heather as a "reward" and because they felt the situation was "under control." *Id.*, ¶¶ 88-89.

After being restrained for a total of 45 minutes, Heather gasped, became unresponsive, and lost consciousness. She was pronounced dead at the hospital about seven hours later, having

suffered two large lacerations to her liver, internal bleeding that caused her abdominal cavity to fill with about a liter of blood, a broken rib, a ruptured spleen, and abrasions to her forehead, cheeks, chin, feet, and torso. *Id.*, ¶¶ 90-92.

The Justice Center investigated Heather's death and concluded that the Employee Defendants implemented a restraint with "'excessive force and/or poor technique'" and committed "'serious physical abuse.'" *Id.*, ¶ 129. Abdo subsequently pleaded guilty to criminally negligent manslaughter; DiLallo pleaded guilty to manslaughter and endangering the welfare of an incompetent person. *Id.*, ¶¶ 127-128. Hines cooperated in the Justice Center and criminal investigations and was not charged. *Id.*, ¶ 130.

Plaintiff instituted this action on June 9, 2020, against the Employee Defendants, along with Laura Saltsman ("Saltsman") and David Viggiani ("Viggiani") ("Senior Supervisory Defendants"); Paul Stevens ("Stevens") and Jennifer Wall ("Wall") ("House Supervisory Defendants"); and Stacey Valder ("Valder") and Thomas Fitzsimmons ("Fitzsimmons") ("Hiring and Assigning Defendants").[1] The Court refers to Saltsman, Viggiani, Stevens, Wall, Fitzsimmons, and Valder collectively as the "State Supervisory Defendants."

The Complaint asserts four causes of action against the State Supervisory Defendants. The Second, Third, and Fourth are brought under the "Fourth/Fourteenth Amendments," while the Sixth asserts a state law negligence claim. The Second Cause of Action is asserted against the House Supervisory Defendants along with the Senior Supervisory Defendants; however, some allegations in the Second Cause of Action are asserted only against the House Supervisory Defendants. The Third Cause of Action names only the House Supervisory Defendants, the Fourth

---

[1] These three categories are utilized by Plaintiff in the Complaint; the Court adopts them here.

names only the Hiring and Assigning Defendants, and the Sixth names all State Supervisory Defendants.

Plaintiff filed proof of service as to Fitzsimmons on July 7, 2020, indicating that he had been personally served on June 13, 2020, in Astoria, New York. ECF No. 10. However, Fitzsimmons failed to appear.

On July 8, 2020, the New York State Attorney General's Office ("AG's Office") filed a Motion to Dismiss on behalf of all the State Supervisory Defendants, except Fitzsimmons. ECF No. 15. The State Supervisory Defendants argue that the Complaint fails to state a claim on which relief may be granted because it fails to plausibly allege their personal involvement in any of the constitutional violations sustained by Heather. Plaintiff filed a Memorandum of Law in opposition. ECF No. 26. The State Supervisory Defendants filed a Reply. ECF No. 32.

At Plaintiff's request, a Clerk's Entry of Default was issued as to Fitzsimmons on July 31, 2020. ECF No. 28. After the AG's Office filed a sworn declaration by Fitzsimmons averring he had not been served in the manner claimed by Plaintiff, ECF No. 30, the Court directed Plaintiff to supply additional proof of service, ECF No. 31.

On August 10, 2020, Plaintiff's counsel filed a letter informing the Court that the AG's Office had stipulated to representing Fitzsimmons in this matter and accepting service on his behalf. ECF Nos. 33 (Letter) & 33-1 (Stipulation).  Plaintiff indicated that she consented to lifting the Clerk's Entry of Default against Fitzsimmons, whom she agreed had fully joined in the pending Motion to Dismiss. *Id.*

## DISCUSSION

I.     **Rule 12(b)(6)**

5

A defendant may move to dismiss a complaint under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint must allege "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and where it "pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557; brackets omitted in original; some internal quotation marks omitted). A complaint "must be dismissed" when the allegations have not "nudged [the] claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570.

For purposes of deciding a Rule 12(b)(6) motion, the Court must "assume [the] veracity" of the complaint's "well-pleaded factual allegations[.]" *Iqbal*, 556 U.S. at 679. However, this presumption of truth is "inapplicable to legal conclusions." *Id.* at 678. Determining whether a claim is plausible on its face is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The Supreme Court reiterated in *Iqbal* that courts may infer from the complaint's factual allegations an "'obvious alternative explanation'" which suggests lawful conduct by a defendant rather than the unlawful conduct the plaintiff would urge the court to infer. *Id.* at 682 (quoting *Twombly*, 550 U.S. at 567).

## II.    Section 1983

Section 1983 creates a cause of action against a "person who, under color of any [state law], subjects, or causes to be subjected, any [person] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Because "government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*[,]" *Iqbal*, 556 U.S. at 676 (citations omitted), the "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001) (citation omitted).

The fact that a defendant holds a high-level position in a hierarchical chain of command, without more, does not establish personal involvement in the constitutional violation. *E.g.*, *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). In the Second Circuit, a plaintiff may establish personal involvement by showing that:

> (1) the [supervisor] participated directly in the alleged constitutional violation, (2) the [supervisor], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [supervisor] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the [supervisor] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [supervisor] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring.

*Johnson*, 239 F.3d at 254 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

Because *Iqbal* "explicitly rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution,'" 556 U.S. at 676-77, it called into question the "continuing vitality of the supervisory liability test set forth in *Colon*." *Reynolds v. Barrett*, 685 F.3d 193, 205-06 n. 14 (2d Cir. 2012). "Some district courts have interpreted *Iqbal* to mean that the second, fourth, fifth, and part of the third *Colon*

factors are no longer viable bases for liability in any context." *Carpenter v. Apple*, No. 915CV1269GTSCFH, 2017 WL 3887908, at *9 n. 4 (N.D.N.Y. Sept. 5, 2017) (collecting cases). "The majority of district courts, however, have held that all five *Colon* factors survive where the constitutional violation at issue does not require a showing of discriminatory intent." *Id.* & n. 5 (collecting cases). The Second Circuit has not yet "determined the contours of the supervisory liability test" post-*Iqbal*. *Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014).

The allegations in the Complaint implicate the theories of liability covered by the third, fourth, and fifth *Colon* factors. Because the Court finds that the Complaint's allegations fail to state a plausible claim for relief under those factors, it need not delve into the issues surrounding their continued viability at this time.

## III.   Sufficiency of the Allegations Regarding Supervisory Liability

### A. Overview of the Complaint

Generally speaking, the allegations in the Second, Third, and Fourth Causes of Action may be grouped into the following categories of acts or omissions: (i) gross negligence or deliberate indifference in hiring DiLallo; (ii) the unconstitutional policy of failing to have a supervisor onsite at 30 Pierce during all shifts; (iii) gross negligence or deliberate indifference in supervising staff at 30 Pierce, including the failure to investigate alleged staff abuse of Heather and move her to a different DDSO/OPWDD facility; and (iv) gross negligence or deliberate indifference in supervising and reassigning DiLallo to 30 Pierce, and gross negligence or deliberate indifference in assigning Hines and Abdo to 30 Pierce. The Court addresses these categories in turn below.

### B. Improper Hiring of DiLallo

#### 1. Relevant Law

The Supreme Court has observed that "[c]ases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause" because "[i]n the broadest sense, every injury is traceable to a hiring decision." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 415 (1997) ("*Bryan Cty.*").[2]    For that reason, "a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury." *Id.* at 412. "Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* at 412 (emphases in original); *see also Morris,* 299 F.3d at 923 ("The prior complaints in an applicant's background must be nearly identical to the type of officer misconduct that caused the constitutional deprivation allegedly suffered by a plaintiff.") (collecting circuit cases).

In *Bryan Cty.*, a sheriff's deputy used excessive force on the respondent, breaking both of her knees while forcibly removing her from her vehicle. The respondent argued that the sheriff had conducted an inadequate background check of the deputy, who had previously pleaded guilty

---

[2] The Court recognizes that *Bryan Cty.* was a Section 1983 case involving municipal liability rather than supervisory liability. That does not render it inapposite, however, because the necessity of demonstrating causation is equally important in both contexts. *Compare Bryan Cty.*, 520 U.S. at 410 ("To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged."); *with Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir. 2002) ("[A] supervisor may be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and her injury.") (citations omitted). Moreover, courts regularly have applied *Bryan Cty.* to analyze supervisory liability claims based on hiring decisions. *See, e.g.*, *Rivera v. Bonner*, 952 F.3d 560, 565 (5th Cir. 2017) ("When a plaintiff alleges that a supervisor inadequately considered an applicant's background, 'deliberate indifference exists where adequate scrutiny . . . would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to hire would be the deprivation of a third party's constitutional rights.'") (quotation omitted; citing *Bryan Cty.*, 520 U.S. at 411); *Morris v. Crawford Cty.*, 299 F.3d 919, 924-25 (8th Cir. 2002) (citing *Bryan Cty.* in analysis of whether sheriff was subject to supervisory liability for hiring decision).

to several misdemeanors—assault and battery, resisting arrest, and public drunkenness—arising from a fight during college, as well as various driving-related offenses. *Id.* at 413. The sheriff conceded he did not inquire into the underlying conduct or the disposition of the misdemeanor charges before hiring the deputy. The Supreme Court observed that while "inadequate screening of an applicant's record may reflect 'indifference' to the applicant's background," that was "not the relevant 'indifference.'" *Id.* at 411; *see also id.* at 414-15. Instead, a plaintiff must demonstrate that a hiring "decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.*; *see also id.* at 415.

If the constitutional violation suffered by the respondent was not "a plainly obvious consequence of the hiring decision[,]" *id.* at 411, the sheriff's inadequate scrutiny of the deputy's background could not constitute deliberate indifference." *Id.*; *see also id.* at 412-15. While the deputy's background might have made him an "extremely poor job candidate," the sheriff's "inadequate scrutiny" of the deputy's "record cannot constitute 'deliberate indifference' to respondent's federally protected right to be free from a use of excessive force," unless the sheriff "would necessarily" have concluded the deputy was a poor job candidate "*because* [his] use of excessive force would have been a plainly obvious consequence of the hiring decision." *Id.* at 414 (emphasis in original).

Because "[t]he connection between the background of the particular applicant and the specific constitutional violation alleged must be strong[,]" *Bryan Cty.*, 520 U.S. at 412, succeeding on an improper hiring claim is "much harder" than succeeding on a failure to train claim. *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 30 (1st Cir. 2005) (citing *Bryan Cty.*, 520 U.S. at 409 ("The proffered analogy between failure-to-train cases and inadequate screening cases is not persuasive.")); *see also id.* at 30-31 (collecting circuit cases where municipality not liable

for inadequate screening of officer who used excessive force, even where officer's background contained complaints of physical violence, including acts of aggression and assault).

### 2. Application

Plaintiff alleges that the House Supervisory Defendants and Hiring and Assigning Defendants failed to conduct a proper background check of DiLallo or, in the alternative, conducted a background check but then improperly ignored the following "red flags" which should have deterred them from hiring her:

- At her deposition in an unspecified case, DiLallo testified she "had carried out 'hundreds' of takedowns in her career," ECF No. 1, ¶ 98 (quotation omitted in original), which "demonstrates a dangerously disproportionate tendency for the use of force in these contexts," *id.* Plaintiff alleges that this number of "takedowns" "would be inconsistent" with the SCIP-R policy, which emphasizes minimizing the use of physical force, *id.*;
- Her history of "'hundreds' of takedowns" amounts to the "use of excessive force," *id.*, ¶ 170;
- She was terminated from St. Joseph's Villa for "misconduct relating to medication for individuals" under care of that organization, *id.*, ¶ 106, and lied about it on her OPWDD employment application, *id.*;
- She subsequently was fired from Lifetime Assistance after she had been disciplined on two occasions "for neglecting patients or for failing to report the abuse of these patients," *id.*, ¶ 101;

The State Supervisory Defendants assert that Plaintiff's use of the phrase "takedowns" is "doubly incorrect," because it does not accurately reflect DiLallo's deposition testimony, and because, as Plaintiff recognizes, physical restraints do not necessarily involve takedowns. ECF NO. 15-2 at 6 (citing "p. 156" and "Paragraph 59").[3] According to the State Supervisory Defendants, at the deposition in question, DiLallo "was asked [by Plaintiff's counsel] if it was true

---

[3] The Court assumes that the State Supervisory Defendants here are citing page 156 of DiLallo's deposition transcript and paragraph 59 of the Complaint.

that she had been involved in hundreds of restraints—not takedowns—and her response was, 'approximately, yes.'" ECF No. 15-2 at 6  (citing "p. 156").[4] The State Supervisory Defendants also note that DiLallo testified that she had never been criticized or disciplined for her conduct in those restraints. *Id.* (citing "p. 157").  The State Supervisory Defendants argue that Plaintiff's quotation from a portion of DiLallo's deposition testimony means that that the entire transcript is integral to the Complaint, even though the transcript is not attached to the Complaint, such that the Court may consider it without converting their motion to one for summary judgment. ECF No. 15-2 at 6 n. 1 (citations omitted).

It is doubtful that one quotation from DiLallo's deposition in the Complaint necessarily means that the entire deposition transcript is incorporated into the Complaint by reference. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) ("'[L]imited quotation does not constitute incorporation by reference.'") (quoting *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985); citation omitted)). Nonetheless, it is unnecessary to decide whether DiLallo's deposition transcript is "integral to" or "incorporated by reference into" the Complaint because the Rule 12(b)(6) motion may be decided without reference to DiLallo's deposition testimony. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (where court's reference to a fact outside the pleadings was "not a ground for the decision" it did "not run afoul of the rule that a district court must confine itself to the four corners of the complaint when deciding a motion to dismiss under Rule 12(b)(6)").

---

[4] Plaintiff has not disputed the State Supervisory Defendants' assertion that the deposition was conducted in connection with a proceeding brought in the New York Court of Claims with regard to Heather's death. Nor has Plaintiff objected to the State Supervisory Defendants' clarification of the actual question posed by counsel to DiLallo about the number of restraints she had performed. Plaintiff also has not objected to the State Supervisory Defendants' reference to DiLallo's testimony about never having been disciplined for conducting physical restraints or takedowns.

Leaving aside the distinction between "takedowns" and "restraints," the Complaint itself does not allege that DiLallo, either at her previous jobs or at OPWDD, had ever been criticized, counseled, disciplined, reprimanded, or terminated based on her performance of physical interventions, restraints, or "takedowns." Although the Complaint alleges that "hundreds" of "takedowns" is a disproportionate number for DiLallo to have performed, there is no allegation as to the length of DiLallo's career or an indication that such a number is outside standard professional norms, particularly where the patient population requires more frequent physical interventions, as it appears that Heather did here. *See* ECF No. 1, ¶ 52. And, there are no allegations that the physical interventions, restraints, or "takedowns" conducted in the past by DiLallo were performed improperly or contrary to applicable guidelines. The Complaint's assertion that DiLallo, prior to June 18, 2017, had engaged in the "use of excessive force" is unsupported by any well-pleaded factual allegations and, moreover, states a legal conclusion which is not entitled to the presumption of truth.

With regard to DiLallo's previous jobs at St. Joseph's Villa and Lifetime Assistance, there are no allegations that she was terminated due to her improper use of physical restraints or "takedowns," let alone the use of excessive physical force, against residents at those facilities. There are no allegations that DiLallo ever personally abused or assaulted a patient. Indeed, the Complaint is ambiguous about what DiLallo actually did (or failed to do) that resulted in being disciplined at Lifetime Assistance. *See* ECF No. 1, ¶ 101 (stating that DiLallo was disciplined "for neglecting patients *or* for failing to report the abuse of these patients") (emphasis supplied).

An allegation of past neglect against a person being hired to care for vulnerable individuals might be sufficient to demonstrate plausibility if the required showing were "simple or even heightened negligence," *Bryan Cty.*, 520 U.S. at 407, which it is not. However, a "generalized

showing of risk" does not suffice to show deliberate indifference in a hiring decision. *Id.* at 410. The "fact that inadequate scrutiny of an applicant's background would make a violation of rights *more* likely cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation. *Id.* at 410-11 (emphasis in original).

On the facts as currently pleaded, Plaintiff has not plausibly alleged that DiLallo, in light of her employment history, was not just highly likely to inflict *any* injury on a resident, but was highly likely to inflict the *particular* injury—the use of excessive force during a physical restraint—suffered by Heather. *Bryan Cty.*, 520 U.S. at 412. That is, Plaintiff has not plausibly alleged that DiLallo's background made her use of excessive force in restraining Heather a "plainly obvious consequence of the hiring decision." *Id.* at 412-13 (footnote omitted); *see*, *e.g.*, *Haller v. Cty. of Dundy, Neb.*, No. 4:19CV3028 RGK, 2019 WL 2764227, at *9 (D. Neb. July 2, 2019) (after civilian plaintiff refused on-duty police officer's demand to touch her bare breasts, he handcuffed her in the back of his patrol car and forcibly touched her; she sought to hold county liable for hiring officer based on allegations that he "did not meet the minimum requirements to be a law enforcement officer, and had physical and aggressive behaviors and past illegal drug use in his history"; court granted motion to dismiss because plaintiff "fail[ed] to point to anything specific" in officer's background which should have caused the county to conclude that her constitutional injuries would be the "plainly obvious" consequences of hiring him) (citing *Bryan Cty.*, 520 U.S. at 412); *Hill v. Robeson Cty., N.C.*, 733 F. Supp.2d 676 (E.D.N.C. 2010) (pretrial supervisee's allegations that police officer had been convicted of manslaughter and served time in jail before being hired by county were insufficient to plead strong causal connection between conviction and officer's alleged sexual abuse of supervisee, as required for municipal liability for

deficient hiring by county in supervisee's § 1983 action, absent allegations that officer engaged in any other unlawful conduct during two decades between release from prison and hiring).

### C. Creation or Maintenance of an Unconstitutional Staffing Policy (Senior Supervisory Defendants and House Supervisory Defendants)

#### 1. Relevant Law

The third *Colon* factor applies when personal involvement is based on the supervisor's creation or maintenance of an improper policy. Courts have described the pleading requirements for this factor as follows: (i) responsibility on the part of defendants for creating the policy or allowing it to continue; (ii) notice to the defendants that the policy resulted in prior constitutional violations; and (iii) causation, i.e., that the policy—either its creation or its continuance— proximately caused the plaintiff's injury. *See*, *e.g.*, *Pusepa v. Annucci*, No. 17-CV-7954 (RA), 2019 WL 720699, at *4 (S.D.N.Y. Feb. 19, 2019) (stating that the third *Colon* factor "requires a plaintiff to adequately allege that the defendant had policymaking responsibility and that, after notice of an unconstitutional practice, the defendant created the improper policy or allowed it to continue, causing the harm.") (citing *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp.2d 354, 364 (S.D.N.Y. 2013) ("'[A]llegations as to defendants' knowledge of alleged constitutional violations [are] insufficient to impose supervisory liability' under § 1983 unless accompanied by allegations that the defendants had direct responsibility for monitoring the alleged violation or that there had been a 'history of previous episodes' putting the defendants on notice of the problem.") (internal and other citations omitted)).

#### 2. Application

Plaintiff alleges that "DDSO policy was not to have a designated supervisor on site at 30 Pierce on all shifts; instead, designated supervisors located off-site—at other DDSO locations—

were expected to supervise staff at 30 Pierce sight-unseen." ECF No. 1, ¶ 119. Plaintiff asserts that the Senior Supervisory Defendants and Housing Supervisory Defendants implemented, or allowed to continue, the policy of not having a supervisor onsite at 30 Pierce during every shift. *See id.*, ¶¶ 143, 149.

Solely for purposes of resolving the pending Motion to Dismiss, the Court assumes that Plaintiff has adequately alleged the existence of a DDSO/OPWDD policy not to have a designated supervisor onsite at 30 Pierce for all shifts. The Court next must assess whether Plaintiff has plausibly alleged that the Senior Supervisory Defendants and the House Supervisory Defendants were responsible for creating this policy, or allowing it to continue.

As to the House Supervisory Defendants, the Complaint alleges neither that they had policy-making authority in general nor that they played any role in creating the specific policy at issue. The Complaint thus does not plausibly allege that the House Supervisory Defendants were personally responsible for enacting or maintaining the policy, which defeats Plaintiff's claim against them based on the third *Colon* factor.

As to the Senior Supervisory Defendants, the Complaint alleges that they were both "responsible for the development and monitoring of OPWDD systems improvement (including quality improvement and plans of corrective action), overseeing the provision of services to developmentally disabled people (including through regular review of clinical and other records), managing recordkeeping and staffing, and promoting best practices in OPWDD facilities in the DDSO, including 30 Pierce." ECF No. 1, ¶¶ 23-24. In addition, the Complaint asserts that they "ordered, were aware of, and condoned this policy." *Id.*, ¶ 119. Assuming that these allegations are sufficient to plausibly allege policy-making authority, the Complaint does not adequately

allege notice and causation, which is fatal to Plaintiff's ability to state a plausible claim of supervisory liability based on the third *Colon* factor.

For instance, as to notice, Plaintiff has not alleged that the policy of not having a supervisor onsite during all shifts at 30 Pierce or other DDSO/OPWDD group homes had resulted in residents being injured or killed after being subjected to improperly performed restraints. In the absence of any allegations that the staffing policy had led to violations of DDSO/OPWDD residents' constitutional rights, Plaintiff cannot plausibly allege the Senior Supervisory Defendants or House Supervisory Defendants had notice the staffing policy was problematic. *Contrast with Doe v. Kaplan*, No. 16-CV-9870, 2018 WL 1449523, at *6 (S.D.N.Y. Mar. 22, 2018) (finding that inmate victim of sexual assault stated claim under third *Colon* factor where it was "plausible that [two supervisory defendants] would have been notified of the five prior instances of convictions and/or charges of 3rd degree rape of Bedford corrections officers between the 2009 and 2015, and would have been responsible for deciding how to change Bedford's policies and procedures related to sexual conduct") (internal citation to record and other citations omitted); *Carpenter v. Apple*, No. 915CV1269GTSCFH, 2017 WL 3887908, at *10 (N.D.N.Y. Sept. 5, 2017) (finding that inmate victim of sexual assault stated claim for supervisory liability under third *Colon* factor; stating that "what nudges Plaintiff's allegations over the line from conceivable to plausible is the fact that she has alleged that [the supervisory defendant] was on notice of previous incidents at ACCF involving male corrections officers having inappropriate sexual contact with female detainees") (quotation to record and footnote omitted).

The Complaint likewise has not plausibly alleged that the staffing policy caused the constitutional violations at issue in this case. "Where acts of third parties are involved, which will generally be the case in section 1983 claims where a supervisor's liability is premised only on her

creation of a 'policy or custom,' the supervisor may be held liable for 'those consequences attributable to *reasonably foreseeable* intervening forces.'" *Marom v. City of New York*, No. 15-CV-2017 (PKC), 2016 WL 916424, at *16 (S.D.N.Y. Mar. 7, 2016), *on reconsideration in part*, No. 15-CV-2017 (PKC), 2016 WL 5900217 (S.D.N.Y. July 29, 2016) (citing *Warner v. Orange Cty. Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1996) (internal quotation marks omitted and emphasis added in original)). "[I]f the constitutional deprivation at issue was not a foreseeable consequence of any alleged policy or custom, or the deprivation was caused by some unforeseeable intervening event, plaintiffs have not stated a plausible claim against a supervisory defendant." *Id.* (citing *Victory v. Pataki*, 814 F.3d 47, 69 (2d Cir. 2016) (affirming dismissal of claims against governor for lack of personal involvement where plaintiff only alleged that governor had a blanket policy of opposing parole to violent offenders, but did not allege that the policy led the governor's staff "to intervene in parole decisions" or to ratify "the rescission procedures employed by the Board of Parole"), *as amended* (Feb. 24, 2016)).

On the facts set forth in the Complaint, Plaintiff has not alleged that the deprivation of constitutional rights that occurred here—Heather's tragic homicide—was a foreseeable consequence of not having a supervisor onsite at 30 Pierce. As discussed above, the Complaint has not alleged that the staffing policy at 30 Pierce had caused similar incidents in which residents were injured or killed as a result of improperly applied physical restraints. Conversely, the facts as alleged plausibly suggest that the constitutional deprivation was caused by an "unforeseeable intervening event," namely, the Employee Defendants' performance of a physical restraint on Heather in a manner that was contrary to and in disregard of their training and OPWDD policy.

As a final matter, the Court observes that although Plaintiff suggests that the absence of a supervisor onsite at 30 Pierce contravened the SCIP-R policy, the provision from the SCIP-R

policy quoted in the Complaint merely states that a "supervisor *on duty* is to be notified" when a patient is held in a "CRIP-R 'Restrictive Intervention' for ten minutes." ECF No. 1, ¶ 65 (quotation omitted in original; emphasis supplied). Plaintiff does not allege that, on the day of the incident, there was not a supervisor on duty, albeit located offsite, for the Employee Defendants to notify when their restraint of Heather continued for more than ten minutes. Thus, Plaintiff has not plausibly alleged that the purported policy of not having a supervisor onsite during all shifts violated the SCIP-R policy.

### D. Gross Negligence or Deliberate Indifference in Supervising Staff Assigned to 30 Pierce (Senior Supervisory Defendants and Housing Supervisory Defendants)

#### 1. Relevant Law

As noted above, the fourth *Colon* factor applies when a supervisor was "grossly negligent in supervising subordinates who committed the wrongful acts," while the fifth *Colon* factor is implicated when a supervisor "exhibited deliberate indifference" to the plaintiff's rights "by failing to act on information indicating that unconstitutional acts were occurring," *id.* Causation again is a critical part of fulfilling both the fourth and fifth *Colon* factors. "[A] supervisor may be found liable for his [or her] deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his [or her] gross negligence in failing to supervise . . . subordinates who commit such wrongful acts, provided that the plaintiff can show *an affirmative causal link* between the supervisor's inaction and her injury." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) (footnote and citations omitted; emphasis added).

#### 2. Application

The Complaint alleges that the Senior Supervisory Defendants and the House Supervisory Defendants were "grossly negligent in managing staffing and supervision . . . at 30 Pierce," ECF

No. 1, ¶ 141; and  "exhibited deliberate indifference to [Heather]'s rights by failing to staff 30 Pierce with supervisors properly trained to oversee and intervene in SCIP-R interventions despite knowing that such supervision was mandated per OPWDD's own policies[;]" *id.*, ¶ 142.

This is the extent of the allegations against the Senior Supervisory Defendants regarding their inadequate supervision of staff at 30 Pierce. These allegations assert no more than legal conclusions which are are not entitled to the presumption of truth and are inadequate to state a plausible claim for relief.  The Court notes that there are no allegations that, up until June 18, 2017, any staff member, including the Employee Defendants, had acted contrary to the appropriate standard of care with regard to Heather, or had deficiently performed any physical restraints or "takedowns" of her or other residents.

The Complaint sets forth additional allegations specifically against the House Supervisory Defendants—that they were "grossly negligent in managing [Heather]'s care," and "exhibited deliberate indifference to [Heather]'s rights by failing to staff 30 Pierce with staff properly trained to manage [her] mental health conditions, especially as they related to aggression." ECF No. 1, ¶¶ 154-155. Plaintiff also alleges that the House Supervisory Defendants "took no action to protect" Heather despite knowing that she was "in a uniquely vulnerable position in the days before her death, including the night before her death." *Id.*, ¶ 157. Finally, Plaintiff asserts that the House Supervisory Defendants failed to relocate Heather "even after having been advised [she] should be relocated away from 30 Pierce due to her relationship with staff." *Id.*, ¶ 156; *see also id.*, ¶ 147 (asserting that House Supervisory Defendants failed to investigate "credible allegations" of abuse of Heather by staff at 30 Pierce and failed to move Heather).

The Court first considers Plaintiff's assertion that the House Supervisory Defendants were grossly negligent or deliberately indifferent based on their failure to staff 30 Pierce with employees

properly trained to manage Heather's mental health conditions. The Complaint alleges that when they visited 30 Pierce on the night of June 17, 2017, the day before Heather's death, the House Supervisory Defendants "did nothing to address the need for closer supervision of staff overseeing Heather's care." ECF No. 1, ¶ 60. The Complaint, however, lacks allegations that plausibly suggest such a "need for closer supervision" or that staff at 30 Pierce were not handling Heather's care appropriately. Notably, on June 17, 2017, the day before Heather's death, DiLallo had taken her to a clinic to have blood drawn. *Id.*, ¶ 58. Although Heather was "agitated," "screaming," "crying," and asking to go the hospital, the trip to the clinic ended without incident, even though Heather was in an agitated state. *Id.* On the night of June 17, 2017, an unidentified staff member reported that Heather had woken up agitated and, in her words, "'not in control of herself." The staff member restrained Heather in a "standing wrap" which did not injure her and resulted in Heather being calmed down and released within two minutes. *Id.*, ¶ 59.

The Court next considers Plaintiff's allegations that the House Supervisory Defendants were grossly negligent or deliberately indifferent based on their failure to move Heather to another facility. According to the Complaint, Heather reported to the Justice Center on March 20, 2017, that she was "afraid she would be killed by staff," and on "other occasions, Heather reported her fears by calling 911." ECF No. 1, ¶ 46. The Complaint contains no further detail about the identities of the staff in the March 20, 2017 complaint, or the dates or contents of the 911 calls. Plaintiff alleges that these calls and reports were then conveyed to the House Supervisory Defendants, who improperly took no action. *Id.*, ¶ 47.

The Complaint does not allege that DiLallo, Abdo or Hines were the "staff" who were the subject of Heather's March 20, 2017 call. Indeed, it could not have involved DiLallo or Hines, as Plaintiff concedes that they were not working at 30 Pierce at the times. Though Abdo was working

at 30 Pierce in March 2017, the Complaint explicitly alleges that she had "never initiated a takedown" and "was known among her colleagues as someone would avoid participating in takedowns at all cost." ECF No. 1, ¶ 123. In addition, the Complaint indicates that Abdo—prior to the incident at issue—had properly handled one of Heather's "behavioral outburst[s]" by calling 911 to have an MHA conducted. *Id.*, ¶ 45. The Complaint alleges that calling for an MHA was the preferred method of handling Heather's outbursts and what should have been done on the day Heather was killed. *Id.*, ¶¶ 43-45. Thus, the Complaint fails to allege any prior interactions between Abdo and Heather that suggested Heather was afraid of Abdo or that Abdo had treated Heather inappropriately.

The Complaint also alleges that on April 24, 2017, while being transported to the hospital for an MHA, Heather told emergency medical services ("EMS") personnel that "staff at 30 Pierce 'do not treat her right,'" and EMS personnel "observed fingertip bruises that may have indicated possible abuse." ECF No. 1, ¶ 54. A nurse at the hospital recorded that "30 Pierce staff members told EMS that Heather 'just needs a good slap.'" *Id.* These observations led to the involvement of a hospital social worker, who "decided to call adult protective services 'to investigate possible abusive behavior in [Heather's] group home" and recommended that Heather not be returned to 30 Pierce. *Id.*, ¶¶ 55-56. Stevens, one of the House Supervisory Defendants, informed the social worker that it was "'next to impossible' to move" Heather and "recommended instead that she be 're-evaluated' by psychological staff" at the hospital. *Id.*, ¶ 56.  The Complaint alleges that Heather was returned to 30 Pierce "as a result of Defendant Stevens's recommendation." *Id.*

None of the staff members involved in the April 24, 2017 allegations are identified and, again, they could not have included DiLallo or Hines as they were not yet assigned to 30 Pierce. There are no allegations that hospital staff called adult protective services or found that the

fingertip bruises were the result of abuse. Although the Complaint asserts that Heather was returned to 30 Pierce based on Stevens' recommendation, in the previous sentence, the Complaint states that Stevens' recommendation was actually that Heather be reevaluated by psychological staff at the hospital. Then, after being reevaluated by psychiatric staff at the hospital, Heather was returned to 30 Pierce. An "'obvious alternative explanation' for the [chronology of events]," *Iqbal*, 556 U.S. at 682 (quotation omitted), is that Heather's allegations of abuse were not substantiated, and the psychiatric staff who evaluated her deemed it appropriate for her to return to 30 Pierce. Because Plaintiff has "also plead[ed] facts supporting more-plausible, [lawful] explanations for defendants' alleged conduct," *Kajoshaj v. New York City Dep't of Educ.*, 543 F. App'x 11, 16 (2d Cir. 2013) (summary order), the allegations about the failure to move Heather do not fulfill the plausibility standard.

In sum, the Court finds that the Complaint's allegations fail to raise a plausible claim against the House Supervisory Defendants for inadequate supervision under the fourth or fifth *Colon* factors because Plaintiff has not adduced sufficient factual matter, taken as true, that plausibly alleges they "fail[ed] to act on information indicating unconstitutional acts were occurring," or that there was "an affirmative causal link between [their] inaction and [Heather]'s injury." *Poe*, 282 F.3d at 140.

### E.  Inadequate Supervision and Assignment of DiLallo, Hines, and Abdo

Plaintiff asserts that the Hiring and Assigning Defendants and the House Supervisory Defendants erroneously failed to terminate DiLallo after learning of unspecified "performance failures" and then improperly reassigned her to 30 Pierce. ECF No. 1, ¶¶ 117, 145-146, 169. Plaintiff cites the following "performance failures" by DiLallo that allegedly should have alerted

the Hiring and Assigning Defendants and the House Supervisory Defendants she was likely to use excessive force against Heather:

- DiLallo told "OPWDD staff" in August 2016, ten months prior to the incident at issue, that she was "feeling 'overwhelmed' in the position." ECF NO. 1, ¶ 112.
- DiLallo "testified" at an unidentified proceeding—presumably her deposition in the Court of Claims matter—that she "suffered anxiety attacks during her time working for OPWDD." *Id.*
- The House Supervisory Defendants were informed in May 2017, that DiLallo "had become 'verbally aggressive' with a resident" at 2303 Penfield South, another facility operated by DDSO/OPSWDD. *Id.*, ¶ 114;
- DiLallo's immediate supervisor "objected" to her remaining at 2303 Penfield South. *Id.*, ¶ 115.
- DiLallo's immediate supervisor informed the House Supervisory Defendants that she had given her six "'counsellings [sic]'—the equivalent of formal admonitions for workplace failures—with no effect." *Id.*, ¶¶ 114-115.
- The House Supervisory Defendants met with DiLallo on May 8, 2017, to "discuss . . . [her] performance failures" and her "complaints about her superiors." *Id.*, ¶ 116.

As noted above, the Second Circuit has explained that in the context of supervisory liability, the gross negligence standard "is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Raspardo*, 770 F.3d at 117 (citing *Johnson*, 239 F.3d at 255 (holding that, where complaint alleged supervisors were aware teacher assaulted students on four occasions prior to his assault of the plaintiff, "a jury could find the [s]upervisors personally involved in the unconstitutional deprivation on the basis that they were . . . grossly negligent in supervising" the teacher); other citations omitted). To establish deliberate indifference in the context of a failure to supervise claim, "the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citation omitted). "An obvious need may be demonstrated through proof of repeated

complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.*

DiLallo's feeling of being overwhelmed at her job, expressed to her supervisors 10 months before the incident, cannot plausibly be considered employee misconduct or in any way causally connected to the events of June 18, 2017. Moreover, there is no suggestion that DiLallo communicated to her supervisors that she was experiencing panic attacks, to the extent that allegation is even relevant.

The only item of problematic behavior that Plaintiff has identified is that DiLallo, in May 2017, had an aggressive verbal exchange with a resident. While the Complaint does allege that staff were directed not to escalate encounters with Heather, DiLallo had a single incident of verbal aggressiveness in her record prior to June 18, 2017. Assuming that this one incident constitutes "prior substantial misconduct," which is highly doubtful, it is not similar to the performance of a physical restraint on a resident in a manner contrary to proper procedure and training which results in that resident's death. Moreover, the House Supervisory Defendants met with DiLallo before reassigning her to 30 Pierce; thus, they did not ignore the incident that occurred at her previous work assignment. And, as mentioned above, on June 17, 2017, DiLallo was able to handle a volatile situation with Heather, without engaging in a verbal or physical confrontation.

Finally, as to Hines and Abdo, the Complaint alleges no misconduct on their parts; rather, it simply asserts that they were inexperienced in performing physical restraints, and that Abdo in particular avoided performing them. Plaintiff contends that Hines and Abdo should not have been assigned to 30 Pierce because of their lack of experience in performing physical restraints. *Id.*, ¶¶ 122-123. At the same time, however, Plaintiff asserts that a physical restraint should not have been

25

used on June 18, 2017, in response to Heather's outburst about being denied access to the phone. Rather, the Complaint states that the Employee Defendants should have used calming techniques or called 911 to have Heather brought to the hospital to be calmed down and treated. *Id.*, ¶¶ 74, 89. In addition, the Complaint alleges that the Employee Defendants had received training on how to properly perform restraints according to the SCIP-R policy. *Id.*, ¶ 81. According to the Complaint, the constitutional violation occurred because they disregarded that training. Plaintiff thus has not plausibly alleged a sufficient causal connection between Hines' and Abdo's inexperience with performing physical restraints and the constitutional violation suffered by Heather.

The Court finds that the Complaint fails plausibly to allege "prior substantial misconduct" by DiLallo, misconduct by DiLallo that was similar to the misconduct that led to the constitutional injury at issue, or any misconduct at all by Abdo and Hines. Likewise, the Complaint does not set forth plausible allegations that there had been "repeated complaints of civil rights violations" or other serious misconduct so as to create an "obvious need" for "more or better supervision" of DiLallo, Hines, or Abdo. While the Court must draw all reasonable inferences in Plaintiff's favor, it is not plausible, on the facts alleged, to draw the inference Plaintiff urges as to DiLallo—that an employee who had one counseling for being verbally aggressive with a resident, who had no record of being counseled or disciplined for improperly performing physical restraints, and who had no record of being physically aggressive with residents, would go on to act in a manner so contrary to her training that it resulted in the death of a resident. It also is not plausible to draw such an inference as to Hines and Abdo, who had no misconduct in their employment history. In sum, the Complaint does not plausibly allege that the House Supervisory Defendants "exhibited gross

negligence or deliberate indifference" to "a high risk that [the Employee Defendants] would violate [Heather]'s constitutional rights," *Poe*, 282 F.3d at 140, by using excessive force against her.

### F.   Amendment of the Complaint

Because the State Supervisory Defendants have not yet filed a responsive pleading in the action, Plaintiff is entitled to amend her Complaint as a matter of right without leave of Court. *Barbara v. New York Stock Exch., Inc.*, 99 F.3d 49, 56 (2d Cir. 1996) (citing 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1483, at 584–85 (2d ed. 1990) (noting that a motion to dismiss is not a responsive pleading within the meaning of Fed. R. Civ. P. Rule 15(a)); *Washington v. New York City Bd. of Estimate*, 709 F.2d 792, 795 (2d Cir.), *cert. denied*, 464 U.S. 1013 (1983)). If Plaintiff elects not to file an amended complaint, the Second, Third, and Fourth Causes of Action, which assert federal claims against the State Supervisory Defendants, will be dismissed with prejudice; and the Sixth Cause of Action, which asserts a state law negligence claim against the State Supervisory Defendants, will be dismissed without prejudice. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'") (quoting 28 U.S.C. § 1367(c)(3)).

## CONCLUSION

For the foregoing reasons, the Rule 12(b)(6) Motion to Dismiss filed by the State Supervisory Defendants (Saltsman, Viggiani, Stevens, Wall, Fitzsimmons, and Valder), ECF No. 15, is GRANTED; and the Clerk's Entry of Default as to Thomas Fitzsimmons, ECF No. 28, is VACATED on consent of the parties. Plaintiff's proposed amended complaint, should she choose to file one, is due thirty (30) days from the date of entry of this Decision and Order.

IT IS SO ORDERED.

Dated: October 29, 2020
      Rochester, New York

                                    HON. FRANK P. GERACI, JR.
                                    Chief Judge
                                    United States District Court