UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

HOLLY PARKS, as Administrator of the
Estate of her daughter HEATHER ROSELLI,

                              Plaintiff,              Case # 20-CV-06384-FPG

v.                                            DECISION AND ORDER

PAUL STEVENS, JENNIFER WALL,
SARAH DILALLO, SANDRA ABDO,
JASMINE HINES, and JOHN/JANE DOES
1-10,
                              Defendants.
_____

## INTRODUCTION

Plaintiff Holly Parks commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983") on behalf of her daughter, Heather Roselli ("Heather"), a 36-year-old developmentally disabled woman who was killed while in the care of the New York State Office for People with Developmental Disabilities ("OPWDD"). ECF No. 1. Presently before the Court is the Motion to Dismiss the Second Amended Complaint ("SAC") by Paul Stevens ("Stevens") and Jennifer Wall ("Wall") (collectively, "Supervisory Defendants"), both of whom hold, or held, supervisory positions with OPWDD. ECF No. 58. For the reasons discussed below, the Motion to Dismiss the SAC, ECF No. 58, is DENIED.

## BACKGROUND

### I.    Procedural Status

In the original Complaint, ECF No. 1, Plaintiff named OPWDD supervisory employees Laura Saltsman, David Viggiani, Stacey Valder, and Thomas Fitzsimmons in addition to Wall and

1

Stevens. All these defendants moved to dismiss the Complaint on the basis that it failed to plausibly allege their personal involvement in the constitutional violations allegedly sustained by Heather. ECF No. 15. After the Court granted that motion, ECF No. 39, Plaintiff timely filed a proposed Amended Complaint which omitted all defendants except Wall and Stevens. ECF No. 40. The Supervisory Defendants filed another Motion to Dismiss, ECF No. 43, arguing that notwithstanding the supplemental allegations, Plaintiff still failed to plausibly allege their personal involvement under any theory of supervisory liability as delineated in *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995).

After Plaintiff filed the Amended Complaint, the Second Circuit issued *Tangreti v. Bachmann*, 983 F.3d 609, 617 (2d Cir. 2020), which held that "after [*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)], there is no special rule for supervisory liability." 983 F.3d at 618 & n.6 (citations omitted). Since the five-factor *Colon* test was just such a rule, this Court noted that *Tangreti* effectively abrogated *Colon*. ECF No. 54 at 5. Under *Tangreti*, the Court noted, the particular source of the underlying constitutional violation has taken on additional importance. *Id.* at 11. Finding the Amended Complaint unclear as to the constitutional grounds for Plaintiff's claims, the Court directed her to file a proposed second amended complaint setting forth the specific constitutional or federal statutory rights which were allegedly violated and by which defendant. *Id.* Finally, the Court found that the Supervisory Defendants had incorrectly applied the supervisory liability standard applicable to an Eighth Amendment claim, which had never been asserted on the facts of this case. *Id.* at 2, 12.

Plaintiff timely filed the SAC. ECF No. 55. Abdo and DiLallo filed Answers to the SAC. ECF Nos. 56, 57. The Supervisory Defendants filed a Motion to Dismiss the SAC, ECF No. 58, arguing that, notwithstanding the supplemental allegations, the SAC still plausibly fails to allege

2

their personal involvement for purposes of supervisory liability. *See* ECF No. 58-1. Plaintiff opposed the Motion to Dismiss, ECF No. 63, as did DiLallo, ECF No. 62. The House Supervisory Defendants filed a Reply. ECF No. 64.

## II.     Summary of the SAC's Allegations

At the time of her death on June 18, 2017, Heather was living at the Community Residence at 30 Pierce Street ("30 Pierce"), an eight-resident Individualized Residential Alternative ("IRA") run by the OPWDD. ECF No. 55 ¶¶ 13, 111. On any given eight-hour shift, only two or three staff members were assigned and present at 30 Pierce. *Id.* ¶ 111. No supervisory personnel were posted at 30 Pierce on several shifts. *Id.* The policy was not to have a designated supervisor on site at 30 Pierce on all shifts; instead, designated supervisors at other locations were expected to supervise staff at 30 Pierce. *Id.* ¶ 112.

Sandra Abdo ("Abdo") was employed by OPWDD as a Direct Supervising Assistant. *Id.* ¶ 17. Sarah DiLallo ("DiLallo") and Jasmine Hines ("Hines") were Direct Supervising Assistant Trainees. *Id.* ¶¶ 16, 18. Abdo, DiLallo, and Hines (collectively, "Employee Defendants") provided direct care to Heather and the other residents at 30 Pierce. *Id.*

Stevens was a Treatment Team Leader and was involved in supervising 30 Pierce and coordinating Heather's behavior support plan ("BSP"). *Id.* ¶ 19. Wall was a Development Assistant 3, Resident Manager, who was involved in supervising 30 Pierce and other area IRAs. *Id.* ¶ 20. Stevens and Wall worked together in managing Heather's care, communicated all relevant information about Heather with each other, and made decisions jointly about her care. *Id.* ¶ 21.

Because Heather's mental health conditions often caused her to engage in aggressive behaviors towards others, staff were directed not to escalate interactions with her. *Id.* ¶ 36. The

Town of Webster Police Department frequently was summoned to perform mental hygiene arrests ("MHAs") when Heather became aggressive and staff were unable to redirect her. *Id.* ¶ 37. On most MHAs, Heather would be transported to the hospital for specialized care and then returned to her state residence. *Id.* ¶ 38. Between 2013 and 2017, Heather underwent MHAs on at least ten occasions, an extraordinarily high level that should have and, on information and belief, did alert House Supervisory Defendants to Heather's vulnerability and the need for heightened attention by supervisory personnel, since lower-level staff were regularly unable to treat her safely without intervention from police and emergency personnel. *Id.* ¶ 41.

On March 20, 2017, Heather's BSP was modified because of her deteriorating mental state. *Id.* ¶ 43. Heather's use of the residential phone at 30 Pierce was to be closely regulated, and staff were directed to address her phone-use primarily through positive reinforcement. *Id.* On April 26, 2017, Heather's psychologist recorded that recent disruptions in her living situation and other factors had caused "significantly increased anxiety, mood lability, extreme argumentativeness and attention seeking, noncompliance, verbal aggression and physical aggression." *Id.* ¶ 44. By June 1, 2017, Heather's BSP indicated that she would need increased levels of anti-anxiety medication to help control her agitation. *Id.* ¶ 45.

From June 2012 to June 18, 2017, eleven complaints of abuse or neglect were made to the Justice Center concerning Heather. *Id.* ¶ 49. From June 2004 to June 18, 2017, twenty-three such complaints were made to the OPWDD. *Id.* ¶ 50. For instance, on March 20, 2017, Heather reported to the Justice Center that she was afraid she would be killed by staff at 30 Pierce. *Id.* ¶ 55. Heather also called 911 on several occasions to report that she feared for her safety at 30 Pierce. *Id.* ¶ 51. The House Supervisory Defendants were informed of the details of these complaints and 911 calls. *Id.* ¶ 56.

On March 10, 2017, Jessica Isaac ("Isaac"), Heather's long-time community care volunteer, met with representatives from the local OPWDD office and 30 Pierce to address Heather's frequent request to be moved due to harassment by staff. *Id.* ¶ 52. Isaac had long been concerned about the conditions at 30 Pierce and the staff's treatment of residents. *Id.* Wall and Stevens either were present at the meeting with Isaac or were informed of what occurred during it. *Id.* ¶ 53.

On April 24, 2017, while Heather was at her day rehabilitation program, she had to be taken to Rochester General Hospital ("RGH") on an emergency basis. *Id.* ¶ 60. A supervisor at 30 Pierce dispatched Abdo to follow the ambulance to the hospital. *Id.* Heather told the emergency medical services ("EMS") personnel that the staff at 30 Pierce "do not treat her right," and EMS personnel "noticed finger tip bruises on the pt's arm that may indicate possible mistreatment from the home that is triggering the pt's acute aggression." *Id.* ¶¶ 62-63. An emergency room nurse at RGH reported that Heather "complained that her 'private parts hurt' because 'the staff at her group home gives her wedgies." *Id.* ¶ 66.

RGH staff reported that Abdo had told EMS personnel that Heather "just needs a good slap." *Id.* ¶ 64. An emergency room doctor recorded that Abdo had made "'a number of remarks' to Heather in the presence of a nurse to the effect that Heather 'belong[ed] in a psych hospital' and that the staff member [i.e., Abdo] was going to remove Heather from [RGH]"; these remarks "acutely agitated" Heather. *Id.* ¶ 67 (first alteration in original). In addition, RGH staff "'state[d] that from their interaction with the pt, she ha[d] been reasonable and cooperative' except when Defendant Abdo was present." *Id.* ¶ 65 (alterations in original).

After failing to find any physical issues that would require in-patient care, the attending physician doctor called a hospital social worker to discuss possible abuse at 30 Pierce. *Id.* ¶ 68.

The social worker in turn called "the director of the group home," who was "attempting to arrange respite placement." *Id.* ¶ 69. At some point, Stevens spoke directly to the social worker, stating "it was 'next to impossible' to move Heather"; he "recommended instead that Heather be 're-evaluated' by psychological staff at RGH." *Id.* ¶ 73. Wall was made aware of Stevens's conversation with the social worker. *Id.*

Heather was reevaluated by psychiatric staff but, after finding no acute symptoms warranting inpatient admission, they decided to discharge her. *Id.* ¶¶ 75-76. However, when Abdo came to pick her up, Heather became "extremely agitated," requiring physical restraint by hospital security personnel and chemical sedation. *Id.* ¶ 76. Consequently, RGH admitted Heather to the hospital and informed Abdo that no staff needed to stay with her overnight. *Id.* ¶ 77.

Heather calmed down once out of the presence 30 Pierce staff members and was released the next day. *Id.* ¶ 78. After Heather was discharged from RGH, the social worker called Adult Protective Services, OPWDD, and the Justice Center to convey hospital staff members' concern that Heather was being abused by staff at 30 Pierce. *Id.* ¶¶ 77, 79. However, Stevens and Wall did not perform a further inquiry into the concerns raised by RGH staff, such as by questioning Heather, Abdo, or other staff members at 30 Pierce. *See id.*

From that time forward, at least on paper, Abdo was never assigned to care for the group of residents that included Heather. *Id.* ¶¶ 85-86. Abdo was, however, assigned as the "lead staff" member at 30 Pierce frequently during the period before Heather's death. *Id.* ¶ 87.

On April 29, 2017, Heather was placed in a two-person and one-person "takedown" during a shift where Abdo was assigned as "lead staff." *Id.* ¶ 88. In addition, "staff reported [on April 29, 2017,] that Heather was concerned about being cared for by Abdo, and suggested she needed to

6

call the Justice Center to complain about [her]." *Id.* The Supervisory Defendants, and particularly Stevens, reviewed the daily reports on residents and would have been aware that Heather was once again fearful of Abdo, this time in the context of a restraint. *Id.* ¶ 89. Abdo's co-workers said she "was known to have a temper and to have developed a habit of shouting at residents"; she also had been "overheard calling residents 'stupid.'" *Id.* ¶ 91.

At some point prior to Heather's death, DiLallo was demoted to being a probationary employee because she was having trouble meeting the basic competencies for the job. *Id.* ¶ 105. In May 2017, Stevens and Wall were informed that DiLallo had become "verbally aggressive" with a resident at an IRA located at 2303 Penfield South. *Id.* ¶ 107. DiLallo's immediate supervisor reported to Wall and Stevens that DiLallo had received multiple "counselings," the equivalent of formal admonitions for workplace failures, but they had no effect. *Id.* ¶ 107. She objected to DiLallo staying at that IRA. *Id.* ¶ 108.

Wall and Stevens met with DiLallo on May 8, 2017, to discuss her performance problems. *Id.* ¶ 109. Wall and Stevens subsequently transferred DiLallo to 30 Pierce but did not provide her with any additional training or supervision. *Id.* ¶ 110.

On the day of Heather's death, the three staff members working at 30 Pierce were Abdo, DiLallo, and Hines, a brand-new trainee without any practical experience caring for developmentally disabled individuals. *Id.* ¶¶ 115, 118. No supervisor was present. *Id.* ¶¶ 118, 119. Heather came to the office and requested to use the phone to call her stepfather, as it was Father's Day. *Id.* ¶ 136. DiLallo said no and started an argument with Heather, who became agitated. *Id.* ¶ 137. Heather picked up a chair, and DiLallo removed it from her hands and said, "You're going down." *Id.* ¶ 140. DiLallo pulled Heather down onto her back and, along with Abdo and DiLallo, restrained her this way for about 20 minutes. *Id.* ¶ 141-42.

7

In specific contravention of OPWDD policy on the use of physical restraints, *see id.* ¶¶ 120-129, the Employee Defendants, among other things, failed to call a supervisor to obtain permission to continue a restraint for more than 10 minutes, and then restrained Heather on her stomach for an additional 25 minutes. *Id.* ¶¶ 148-55. At that point, she gasped, became unresponsive, and lost consciousness. *Id.* ¶ 159. Seven hours later Heather was pronounced dead at RGH, having sustained multiple severe injuries to her internal organs and significant internal bleeding as a result of the improperly performed prone restraint. *Id.* ¶¶ 160-63.

The Justice Center found that Defendants DiLallo and Abdo "implemented a restraint with excessive force and/or poor technique" and engaged in "serious physical abuse" and "deliberate inappropriate use of restraints." *Id.* ¶¶ 5, 166, 168. Hines cooperated in the Justice Center and criminal investigations and was not criminally charged. *Id.* ¶ 167. Abdo pled guilty to criminally negligent manslaughter and admitted in her allocution to using excessive force. *Id.* ¶ 164. DiLallo pled guilty to manslaughter and endangering the welfare of an incompetent person. *Id.* ¶ 165.

The SAC's First and Second Causes of Action allege claims of excessive force under the Fourth and Fourteenth Amendments, respectively, against the Employee Defendants. *Id.* at 32-34. The Fifth and Sixth Causes of Action allege state law negligence claims against the Employee Defendants and the Supervisory Defendants, respectively. *Id.* at 41-42. The Third and Fourth Causes of Action assert violations of the Fourteenth Amendment's substantive due process clause against the Supervisory Defendants. *Id.* at 35-41. These causes of action are based on the Supervisory Defendants' inadequate staffing of DDSO-managed houses, and particularly 30 Pierce, *see id.* ¶¶ 190-192; their inadequate supervision of the Employee Defendants, and particularly their assignment of Abdo and DiLallo to care directly for Heather, *id.* ¶¶ 193-195, 197; their failure to staff 30 Pierce with individuals competent in addressing Heather's heightened care

needs, *id.* ¶¶ 205-207; and their failure to move Heather to a different residence despite credible allegations that she had been abused by staff members, including Abdo, *id.* ¶ 196.

## DISCUSSION

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To state a claim upon which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show[ ]" that he or she is "entitled to relief" for purposes of Rule 8 means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, "[t]he plausibility standard is not akin to a 'probability requirement[.]'" *Id.* at 679 (quoting *Twombly*, 550 U.S. at 556). "[O]n a motion to dismiss for failure to state a claim, the question [is] . . . 'not whether [the plaintiff] will ultimately prevail' on his . . . claim, but whether his complaint was sufficient to cross the federal court's threshold[.]" *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (internal quotation and citation omitted)

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).
9

As noted above, the SAC now alleges two causes of action directly against the Supervisory Defendants under the Fourteenth Amendment's Substantive Due Process Clause. *See* ECF No. 55 ¶¶ 187-88, 202-203. The Fourteenth Amendment's Due Process Clause provides in relevant part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

In *Youngberg v. Romeo*, 457 U.S. 307, 314 (1982), the Supreme Court "consider[ed] . . . for the first time the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment." The respondent in *Youngberg* was a profoundly mentally retarded adult who had been involuntarily civilly committed to a state institution because, due to his violent behavioral issues, could not be cared for at home. While committed, he sustained numerous injuries—some of which he caused and some which were caused by other residents' reactions to him—and he also was placed in restraints for extended portions of the day. His mother filed a lawsuit as his next friend alleging that that he had a constitutionally protected liberty interest in safety, freedom of movement, and training within the institution; and that the petitioners infringed these rights by failing to provide constitutionally required conditions of confinement. *Id.* at 315.

The Supreme Court agreed that the respondent possessed "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Id.* at 324; *see also id.* at 317-19. Nonetheless, the Supreme Court held, such rights are "not absolute" in the context of involuntary civil commitment. *Id.* at 319-20.

Balancing the interests of the state against the interests of involuntarily committed mentally ill persons to reasonable conditions of safety and freedom from unreasonable restraints, the Supreme Court determined that "the Constitution only requires that the courts make certain that

professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* at 321. Unless the professional's decision was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment[,]" *id.* at 323, it is "presumptively valid[.]" *id.*

The Supreme Court clarified that by "professional" decisionmaker it meant "a person competent, whether by education, training or experience, to make the particular decision at issue." *Id.* n.30. As examples, the Supreme Court noted that "[l]ong-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the [developmentally disabled]," while "day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons." *Id.* The Supreme Court thus limited the "substantial departure" standard to those professionals, whom it contrasted with "nonprofessional" decisionmakers. *See id.* Nonetheless, there remains "some confusion" as to what standard applies to substantive due process claims brought by involuntarily committed individuals, with some circuits following *Youngberg* and some circuits taking different approaches. *See Surlock v. Delaney*, No. 5:11-CV-1121, 2016 WL 3200273, at *9-10 (N.D.N.Y. June 8, 2016) (collecting circuit authority).

The Second Circuit has applied *Youngberg*'s professional judgment standard to a Fourteenth Amendment substantive due process violation against a psychiatrist, *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 188-89 (2d Cir. 2005), but it has not determined whether to apply it to nonprofessionals. *Id.* In most cases, district courts have found it unnecessary

to elect between a standard because it made no difference to the outcome, but the ones who have done so favor the "deliberate indifference" standard for nonprofessionals. *See*, *e.g.*, *O'dell v. Bill*, No. 9:13-CV-1275 FJS/TWD, 2015 WL 710544, at *6 (N.D.N.Y. Feb. 18, 2015) (collecting cases).[1]

Plaintiff alleges that the Supervisory Defendants were not acting as professional decisionmakers working with specialized knowledge in staffing and supervising 30 Pierce but, even if they were, their actions were a substantial departure from accepted professional judgment, practice, or standards. ECF No. 55 ¶ 189; *but see Vallen v. Carrol*, No. 02 Civ. 5666(PKC), 2005 WL 2296620, at *8 (S.D.N.Y. Sept. 20, 2005) (professional judgment standard was appropriate when considering "higher-level decisions like patient placement and the adequacy of supervision" and the deliberate indifference standard where the defendants were "low-level staff members" who were addressing day-to-day issues, rather than "higher-level decisions"); *G.B. v. DiPace*, No. 114CV0500DNHCFH, 2019 WL 1385840, at *4 (N.D.N.Y. Mar. 27, 2019) (professional judgment standard was appropriate for Treatment Team Leader who oversaw several OPWDD residential facilities; deliberate indifference was appropriate for Developmental Assistant 2/house leader and Developmental Assistant 1/assistant house leader; rejecting argument that latter two defendants were not personally involved because "as individuals overseeing the daily operation of the McChesney facility, they had a certain amount of authority and control over the direction of activities there"). The Court agrees that, even assuming that the Supervisory Defendants were

---

[1] When the Fourteenth Amendment is involved, deliberate indifference is no longer defined in accordance with the Eighth Amendment's subjective standard. *See Darnell v. Pineiro*, 849 F.3d 17, 34-35 (2d Cir. 2017) ("[T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the [plaintiff] must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [plaintiff] even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety. In other words, the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively."), *overruling Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009).

professional decisionmakers as defined in *Youngberg*, Plaintiff has plausibly alleged a Fourteenth Amendment claim against them.

The Second Circuit has described the "substantial departure from professional judgment" standard as requiring "more than simple negligence . . . but less than deliberate indifference." *Kulak v. City of N.Y.*, 88 F.3d 63, 75 (2d Cir. 1996) (citing *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1143, 1146 (3d Cir. 1990) (stating that the "professional judgment" standard represents "a middle-ground between the 'deliberate indifference' standard applicable to prison officials and the 'compelling' and 'substantial' necessity tests"); *Estate of Porter by Nelson v. Illinois*, 36 F.3d 684, 688 (7th Cir. 1994) (agreeing with *Shaw* that "[p]rofessional judgment, like recklessness and gross negligence, generally falls somewhere between simple negligence and intentional misconduct")). In *Shaw*, the Third Circuit observed that "the plaintiff carries a greater burden when trying to show deliberate indifference [under the Eighth Amendment] than when trying to establish a failure to exercise professional judgment." *Shaw*, 920 F.2d at 1150. Though it is "difficult to define with precision . . . the degree of aggravating conduct beyond failure to exercise professional judgment necessary to constitute deliberate indifference[,] . . . [c]aselaw under § 1983 is clear, however, that conduct amounting to a failure to protect rises to the level of deliberate indifference precisely in those circumstances when the defendant specifically knew or should have known of the harm to the plaintiff before it was manifested." *Id.*

Of course, since liability under § 1983 cannot be imposed vicariously or under traditional grounds of respondeat superior, *Iqbal*, 556 U.S. at 676, the fact that one professional defendant failed to exercise professional judgment on the plaintiff's behalf does not mean that all professional defendants are liable. *Shaw*, 920 F.2d at 1147. "In more concrete terms, liability may only be

13

imposed on those defendants who had the power and the responsibility to protect [the plaintiff]'s safety but who failed to do so." *Id.*

Here, Plaintiff has adequately pleaded factual allegations that allow the Court to draw reasonable inferences that the Supervisory Defendants were responsible for Heather's safety and were authorized to make decisions relative to protecting her, and that their actions and omissions were substantial departures from professional judgment resulting in injury and death.

As set forth above in the "Background" section, Plaintiff has alleged that Stevens oversaw Heather's BSP and that he and Wall worked together in managing Heather's care, communicated all relevant information about Heather with each other, and made decisions jointly about her care. At the end of March 2017, the Supervisory Defendants were aware Heather's mental state had been deteriorating significantly and that she accordingly was increasingly vulnerable. At the end of April 2017, the Supervisory Defendants received concerns from credible sources at RGH that Heather was being abused at 30 Pierce and was afraid of Abdo based on a number of observations by hospital and EMS personnel, including bruises on Heather's arms that possibly indicated abuse; complaints by Heather about her treatment by staff at 30 Pierce; Abdo's statement to hospital staff that Heather "just needs a good slap"; and the fact Heather became so acutely agitated upon the mere sight of Abdo that she had to be physically restrained and chemically sedated. RGH staff communicated these concerns to the Supervisory Defendants and requested that she be moved to a different residence.

After Heather was discharged, the Supervisory Defendants did not move Heather to a different IRA. Instead, they allowed Abdo to remain at 30 Pierce but purported not to assign her as a caregiver for Heather. Nonetheless, Abdo was sometimes the "lead staff" member in the home. Several days after her discharge from RGH, Heather was restrained during a shift when Abdo was

assigned as "lead staff." That day, a staff member reported that Heather was concerned about being cared for by Abdo, which suggests that despite the Supervisory Defendants' reassigning Abdo on paper, she was still interacting with Heather. In addition, the Supervisory Defendants reassigned DiLallo, a probationary employee with a documented history of being verbally aggressive to residents, to 30 Pierce and allowed her to care for Heather. The Supervisory Defendants were aware that DiLallo had not changed her behavior despite admonitions by her previous supervisor. However, they did not provide additional training or supervision in general or specifically advise her that interactions with Heather should not be escalated. Compounding the potential risk of injury to Heather, the Supervisory Defendants did not regularly have a supervisor on-site at 30 Pierce, even though OPWDD restraint policy requires a supervisor to be notified if a person is restrained for ten minutes.

"Although there is a presumption of validity accorded to professionals under the *Youngberg* standard, at the pleading stage, Plaintiff only needs to allege facts to show that it is plausible that the [Supervisory] Defendants departed substantially from professional standards." *Miesegaes v. Allenby*, No. CV1501574CJCRAO, 2019 WL 3364582, at *7 (C.D. Cal. June 20, 2019) (citing *Iqbal*, 556 U.S. at 678), *report and recommendation adopted*, 2019 WL 3340688 (July 24, 2019). Indeed, whether conduct was a substantial departure from professional judgment may be, at least on some occasions, a question of fact. *See Youngberg*, 457 U.S. at 323 n.31 (noting that expert testimony may have been relevant to whether the treating professionals' decisions substantially departed from accepted standards). At this stage of the proceedings, accepting Plaintiff's factual allegations as true and drawing all reasonable inferences in her favor, the Court may "draw the reasonable inference," *Iqbal*, 556 U.S. at 678, that it would be a substantial departure from accepted professional judgment to continue to house Heather at 30 Pierce under

the circumstances described above. Although discovery may reveal that the Supervisory Defendants' actions were not a substantial departure from accepted professional judgment, at this stage, Plaintiff has adduced sufficient facts to state claim for a Fourteenth Amendment substantive due process violation based on the Supervisory Defendants' failure to protect her. Therefore, the Court will deny the Supervisory Defendants' Motion to Dismiss the SAC.

## CONCLUSION

For the foregoing reasons, the House Supervisory Defendants' Motion to Dismiss, ECF No. 58, is DENIED. The House Supervisory Defendants are ORDERED to file an answer to the SAC within thirty (30) days of the date of entry of this Decision and Order.

IT IS SO ORDERED.

Dated: January 6, 2022
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
District Judge
United States District Court